UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

FILED
JUN 16 2010

| | | |
|---|---|---|
| DAKOTA, MINNESOTA & EASTERN RAILROAD CORPORATION, a Delaware Corporation, | * * * * | CIV 10-04037-RAL |
| Plaintiff, | * * | OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |
| vs. | * * | |
| KEVIN V. SCHIEFFER, | * * | |
| Defendant. | * * * | |

On April 9, 2010, Plaintiff Dakota, Minnesota & Eastern Railroad Corporation ("DM&E") filed a Complaint (Doc. 1) seeking injunctive relief to prevent Defendant Kevin Schieffer ("Schieffer") from pursuing a Demand for Arbitration before the American Arbitration Association ("AAA"). On April 15, 2010, the Court held a hearing on DM&E's Motion for Temporary Restraining Order, which the Court denied (Doc. 8) because the parties could be heard on DM&E's request for a preliminary injunction prior to any immediate and irreparable harm occurring. On May 13, 2010, the Court held a hearing in this case on DM&E's request for a preliminary injunction and Schieffer's Motion to Dismiss (Doc. 20) and Motion to Consolidate Preliminary Injunction Hearing with Final Injunction Hearing (Doc. 19). For the reasons explained below, the Court now grants Defendant's Motion to Dismiss.

I. FACTS

On September 13, 1994, the parties entered into an Agreement for Consulting ("Consulting Agreement"), under which Schieffer agreed to be available to DM&E for

-1-

"consulting and other specialist services" for 60 months in exchange for a total of $1,530,000 plus hourly fees for time expended over an annual hourly threshold. (Doc. 7-1). Under the Consulting Agreement, DM&E held the option of paying the retainer in full or in monthly installments, and Schieffer would forfeit all compensation if the Agreement were terminated for "Cause" or if he failed to honor the agreement "without Reason." Retainer payments would be suspended if Schieffer suffered from "disability, incapacity or other circumstance" (terms not defined in the Agreement) that would render "provision of such services reasonably beyond Schieffer's control," and payments were to resume after such disability or circumstance ceased. (Id.).

In 1996, DM&E named Schieffer as its President and CEO. Schieffer contends that the Consulting Agreement was suspended when he became President and CEO and that his subsequent discharge rendered the unpaid portion of the retainer due. DM&E asserts that its Board of Directors terminated the Consulting Agreement in December 1999, granting Schieffer bonus stock and cash in return. The minutes from the Board of Directors' meeting from December of 1999 state: "After discussion the Board approved the immediate termination of the consulting arrangement between the Corporation and Mr. Schieffer, granted an additional 10,000 bonus shares to Mr. Schieffer and awarded a cash bonus to Mr. Schieffer in the amount set forth in Exhibit B to these resolutions." (Doc. 7-2).

On December 9, 2004, the parties entered into an "Employment Agreement." (Doc. 7-1). "[A]nticipat[ing] a Change of Control," DM&E's stated purpose for the Employment Agreement was "to encourage the retention and ongoing employment of the Executive and to enter into an agreement embodying the terms of such employment." (Doc. 7-1, at 14). This agreement afforded Schieffer lucrative severance benefits upon a termination without "Cause" or upon resignation for "Good Reason."

The Employment Agreement included sections addressing Schieffer's position, duties, and responsibilities; compensation (divided into subsections outlining Schieffer's base salary, annual incentive award, and employee benefits); bonus share and equity; termination of employment; resolution of disputes; assignability, notices and other communications; as well as a "Miscellaneous" section. The "Employee Benefits" subsection stated that:

> "Executive shall be eligible to participate in all employee health, welfare and retirement benefits and programs made available generally to senior executives of the Company, and to the extent provided in such plans and programs the executive's spouse and other dependents shall be eligible to participate therein. In the event the Executive is not permitted to participate in such plans or programs, whether by law or the terms thereof, the Company shall periodically pay to the Executive, in lieu of such participation, a cash payment equal to the amount the Company would have contributed toward the Executive's participation in the plans or programs."

(Doc. 7-1, ¶ 3(c), at 18).

In 2007, the parties entered into a "Gross-Up Agreement" (Doc. 7-3) designed to offset Schieffer's excise tax liability, specifically liability under Section 409A of the Internal Revenue Code. The Gross-Up Agreement called for all severance payments to be "grossed-up" by an additional payment so that the net amount received by Schieffer after excise taxes would equal the sum he would have received if excise taxes had never been levied. Under the Gross-Up Agreement, payments due within six months of Schieffer's "Separation from Service" (as defined by the Internal Revenue Code) were to be "delayed until the earlier of the end of such six month period and [Schieffer's] death." (Id.).

DM&E terminated Schieffer, purportedly for insubordination, on October 7, 2008, effective October 22, 2008.[1] Schieffer argues that the reasons for his termination did not constitute "Cause" as defined in the Employment Agreement. As required by the Gross-Up

---

[1]The Complaint contained a typographical error, listing the effective date of termination as October 22, 2010.

Agreement, DM&E retained Deloitte Tax LLP ("Deloitte") to evaluate the tax ramifications of benefits payments to Schieffer. Deloitte opined that Schieffer's severance payout was not subject to a Section 409A penalty and thus could be paid immediately.

Ultimately, DM&E paid Schieffer a lump sum of $1,391,866.07 on January 20, 2009, the first bank business day after Deloitte issued its tax opinion. This amount was net of applicable withholdings and excise taxes, as the gross severance payout was $2,966,295.00. Schieffer was dissatisfied with the calculations behind that amount and believed that DM&E owed him more.

On March 25, 2010, Schieffer submitted to the AAA his Demand for Arbitration (Doc. 7-1) disputing DM&E's interpretation of the Employment Agreement and the Consulting Agreement. Schieffer asserted claims under South Dakota contract and state wage laws, seeking the following relief: $247,166.50 for salary continuation; approximately $650,000 for 2008, 2009, and 2010 bonuses; more than $600,000 in allegedly miscalculated benefits, or continued employee benefits plan coverage; double damages for wrongfully withheld wages under SDCL 60-11-7; attorneys' fees; $892,500 as the remaining balance allegedly owed under the Consulting Agreement; and 10 percent interest on unpaid demands under SDCL 21-1-13.1.

In its Complaint, DM&E asserted that Schieffer's Employment Agreement is covered by the Employee Retirement Income Security Act of 1974 ("ERISA") and, consequently, Schieffer's state law causes of action are preempted by ERISA and not subject to arbitration. The Employment Agreement contained an arbitration provision, which provided:

> Any controversy of claim arising out of, or relating to, this Agreement (or any breach thereof) or the Executive's employment with the Company (or any termination thereof) shall, at the election of either Party, be resolved by binding confidential arbitration, to be held in Sioux Falls, South Dakota, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(Doc. 7-1, ¶ 6, at 20).

The Consulting Agreement had no arbitration clause. Schieffer, in his Demand for

-4-

Arbitration, contends that under the broad terms of the arbitration provision, his claim regarding the Consulting Agreement is a "claim arising out of, or relating to" his employment with the Company (or termination thereof)," thereby rendering it subject to resolution by arbitration. (Id.).

## II. DISCUSSION

### A. Injunctive Relief

Whether to grant preliminary injunctive relief turns on the following four factors established in Dataphase Sys. Inc. v. C.L. Sys. Inc.: (1) the threat of irreparable harm to the movant; (2) the likelihood of success on the merits; (3) the balance of harms; and (4) the public interest. 640 F.2d 109, 114 (8th Cir. 1981). However, this Court must first have subject matter jurisdiction before it can grant a preliminary injunction in a case of this nature.

### B. Subject Matter Jurisdiction

DM&E's principal place of business is in South Dakota. Schieffer is a South Dakota resident. Therefore, diversity jurisdiction does not exist in this case under 28 U.S.C. § 1332. As a result, this Court's subject matter jurisdiction hinges on whether there is a federal question under 28 U.S.C. § 1331.

The Federal Arbitration Act ("FAA") does not confer an independent basis of federal jurisdiction. Hall Street Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576 (2008) (FAA "bestow[s] no federal jurisdiction but rather requir[es] an independent jurisdictional basis" for controversies involving arbitration); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 26 (1983) (FAA "does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 or otherwise."); Express Scripts, Inc. v. Aegon Direct Mktg. Servs., 516 F.3d 695, 699 (8th

Cir. 2008) ("arbitration disputes will be considered in federal court only when there is diversity of citizenship or an independent basis for federal jurisdiction.").

In assessing whether this Court has subject matter jurisdiction, it must determine whether the Employment Agreement is or creates an ERISA plan. See Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 931 (8th Cir. 1999) (noting that if plans were "not ERISA plans, there is no federal jurisdiction"). Subject matter jurisdiction would exist if a dispute arises out of an employee benefit plan under ERISA.[2]

DM&E concedes that "no ERISA claims have been pled" by Schieffer in the arbitral forum. (Doc. 23, at 13). However, DM&E contends that (1) the Employment Agreement nevertheless creates or is an ERISA plan, and (2) that the state law claims in Schieffer's Demand for Arbitration thus are preempted by ERISA and should be enjoined from proceeding. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . ." 29 U.S.C. § 1444(a); Shea v. Esensten, 107 F.3d 625, 627 (8th Cir. 1997) ("the language of ERISA's preemption clause sweeps broadly, embracing common law causes of action if they have a connection with or a reference to an ERISA plan.").

Where federal subject matter jurisdiction is dependent on ERISA, but the evidence fails to establish the existence of an ERISA plan, the claim must be dismissed for lack of subject

---

[2]If DM&E's claim arises under ERISA, then the Court could exercise supplemental jurisdiction over Schieffer's Consulting Agreement claim under 28 U.S.C. § 1367 because claims under the Consulting Agreement, according to Schieffer's Demand for Arbitration, arise out of termination of Schieffer's employment with DM&E and therefore appear to be sufficiently related to the Employment Agreement to be part of the same case or controversy under the circumstances.

matter jurisdiction. Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994); see also Harris v. Arkansas Book Co., 794 F.2d 358, 360 (8th Cir. 1986) ("The existence of a plan is a prerequisite to jurisdiction under ERISA."); Jader v. Mut. Life Ins. Co, 925 F.2d 1075, 1076-77 (8th Cir. 1991) (remanding for determination of whether jurisdiction was lacking because there was no ERISA plan).; accord UIU Severance Pay Trust Fund v. Local 18-U, 998 F.2d 509, 510 n.2 (7th Cir. 1993) ("the existence of an 'ERISA-governed plan' is an essential precursor to federal jurisdiction"); Mem'l Hosp. Sys. V. Northbrook Life Ins. Co., 904 F.2d 236, 240 (5th Cir. 1990) (stating that the question of whether an ERISA plan existed was "a jurisdictional one"). "The existence of an ERISA plan is a mixed question of fact and law." Kulinski, 21 F.3d at 256 (citing Harris, 794 F.2d at 360). Because the question of the existence or non-existence of an ERISA plan is jurisdictional, if the Court does not find jurisdiction, then it "may not consider the merits" of Plaintiff's claim. Id. (citing Jader, 925 F.2d at 1077).

Both parties acknowledge that this Court's jurisdiction turns on whether the Employment Agreement constitutes an ERISA plan.[3] State common law causes of action under an employee benefit plan regulated by ERISA are preempted. Metro. Life. Ins. Co. v. Taylor, 481 U.S. 58, 60 (1987) (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987)).

---

[3]During the hearing addressing the motions at issue, the parties discussed at length whether the Employment Agreement established a "top-hat plan." "A so-called 'top-hat' plan is unfunded, provides 'deferred compensation for a select group of management or highly compensated employees,' and is exempted from certain ERISA requirements. See 29 U.S.C. §§ 1051(2) (participation and vesting), 1081(a)(3) (funding), and 1101(a) (fiduciary responsibility) (1994)." Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 932 n.6 (8th Cir. 1999). However, "a 'top hat' plan must be an ERISA 'plan' in the first instance." Id. Therefore, as the Eighth Circuit did in Emmenegger, this Court focuses its analysis on the broader question, which is determinative of the jurisdictional issue: is the Employment Agreement an employee benefits plan within the meaning of ERISA.

DM&E asserts that the Employment Agreement is an ERISA plan and creates an ongoing administrative program subject to ERISA, which Schieffer disputes by arguing that a single employment contract cannot constitute an ERISA plan and that the Employment Agreement does not require an ongoing administrative program requiring DM&E to exercise discretionary decision-making authority sufficient to give rise to an ERISA plan.

ERISA defines an employee benefit plan as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan," 29 U.S.C. § 1002(3), and "any plan, fund, or program . . . established or maintained . . . for the purpose of providing for its participants or its beneficiaries, through the purchase of insurance or otherwise," the following specified benefits:

> (A) [M]edical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or
>
> (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

Id. at § 1002(1). Such benefits include severance benefits. Wallace v. Firestone Tire & Rubber Co., 882 F.2d 1327, 1329 (8th Cir. 1989).

"An employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA Plan." Id. Rather, the issue of whether the Employment Agreement constitutes an ERISA plan turns on the touchstone of "[w]hether the employer requires 'an ongoing administrative program' to meet [its] obligation." Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 12 (1987)). Such a scheme exists when 'to determine the employees' eligibility for and level of benefits, the employer must analyze each employee's particular

circumstances in light of the appropriate criteria." Eide v. Grey Fox Tech. Servs. Corp., 329 F.3d 600, 605 (8th Cir. 2003) (citation omitted) (quoting Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994)). "Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria." Kulinski, 21 F.3d at 257.

Additionally, "[I]n the determination of whether an ERISA plan exists, arrangements that involve a single employee quite understandably have been met with a particularly careful scrutiny. . . it is often more difficult to discern the sort of ongoing administrative management that Congress intended to subject to the regulation of ERISA" for such arrangements. Cvelbar v. CBI Illinois, Inc., 106 F.3d 1368, 1375 (7th Cir. 1997). An employment agreement requiring a one-time, lump-sum payment or single set of payments triggered by a single event is not an ERISA plan, as it "requires no administrative scheme whatsoever to meet the employer's obligation." Fort Halifax, 482 U.S. at 12. An ongoing administrative program typically exists when there are "ongoing benefits to be paid," id. at 14-15 n.9, or if there is a "regularity of payment." Id. at 18 n.12. "Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme." Kulinski, 21 F.3d at 257. Accordingly, the First, Ninth, and D.C. Circuits have all held that a plan does not require an ongoing administrative scheme under ERISA even if the employer must exercise a small amount of discretion. See Rodowicz v. Mass. Mut. Life, 192 F.3d 162, 172 (1st Cir. 1999); Velarde v. PACE Membership Warehouse, Inc., 105 F.3d 1313, 1316-17 (9th Cir. 1997) (holding that

requirement that employees must perform duties in "satisfactory manner" to receive benefits did not constitute an ERISA plan); Delaye v. Agripac, Inc., 39 F.3d 235, 237 (9th Cir. 1994) (holding that severance of employment contract did not require ongoing administrative scheme, even though employer had to determine if employee was terminated for cause to calculate severance pay).

In Fort Halifax, the Supreme Court of the United States held a Maine statute at issue neither established nor required an employer to maintain an employee benefits plan within the provisions of ERISA and, therefore, did not implicate ERISA's preemptive scope. The Maine statute required a one-time, lump-sum payment triggered by a single event (the closing of a plant within the state or relocation more than 100 miles away), the statute did not require employers to pay benefits on a regular basis, the statute made no periodic demands on employer's assets that created a need for financial coordination and control, and the benefits payment obligation was predicated on occurrence of a single contingency. 482 U.S. at 12. Hence, the obligation imposed by the Maine statute "differs radically in impact from a requirement that an employer pay ongoing benefits on a continuous basis." Id. at 14.

In an attempt to differentiate this case from Fort Halifax and to satisfy the test in Petersen and Crews for whether there is an ongoing administrative scheme, DM&E argues that it is required to make various discretionary determinations under Sections 3(c), 5, and 9(f) of the Employment Agreement. (Doc. 23, at 12).

Section 3(c) of the Employment Agreement states as follows:

> (c) **Employee Benefits**. Executive shall be eligible to participate in all employee health, welfare, and retirement benefits and programs made available generally

to senior executives of the Company, and to the extent provided in such plans and programs, the Executive's spouse and other dependents shall be eligible to participate therein. In the event the Executive is not permitted to participate in such plans or programs, whether by law or the terms thereof, the Company shall periodically pay to the Executive, in lieu of such participation, a cash payment equal to the amount the Company would have contributed toward the Executive's participation in the plans or programs.

Section 5 of the Employment Agreement states as follows:

5. **Termination of Employment**

In the event that either Party terminates the Executive's employment hereunder, such termination will be communicated by written Notice of Termination to the other Party at least fifteen (15) days prior to the effective date of such termination. In the event of such termination, other than (a) termination by the Company for Cause, or (b) Voluntary Termination by the Executive, the Company shall pay to the Executive the Severance Payment[4] on the day preceding the effective date of such termination, provided however that in the event Company determines to exercise its pre-Change of Control option described below, it may make said Severance Payment in installments provided for below. The Company shall continue to provide Executive the Employee Benefits described in section 3(c) of this Agreement for a period of not less than three years from the date on which the Severance Payment is paid in full (except in the event Company determines to exercise its pre-Change of Control option described below, such Employee Benefits shall continue for three years from the first payment after Company's notice of the same). In the event Company fails to timely make such Severance Payment (or provide notice of its exercise of the pre-Change of Control option), the Executive shall remain on the Company payroll and be paid at an annual salary rate of 33.33% of the Severance Payment until such time as the Severance Payment is paid in full to Executive (or until receipt of proper notice and the first installment is paid in the event Company determines to exercise its pre-Change of Control option described below). Notwithstanding anything to the contrary in this Section 5, in the event of termination of Executive prior to the first Change of Control following the date of this Agreement, the Company shall have the option of paying Executive the Severance Payment in 36 equal monthly installments of the Severance Payment principal amount, plus interest on the unpaid balance of the Severance Payment compounded at LIBOR plus 2% from the date of termination (the "pre-Change

---

[4]The Employment defines "Severance Payment" as "Two Million Five Hundred Thousand Dollars ($2,500,000), adjusted for inflation from the date hereof pursuant to the U.S. Department of Labor Bureau of Labor Statistics 'Consumer Price Index - Urban Wage Earners & Clerical Workers,' or any reasonable substitute therefor."

of Control option").

Section 9(f) of the Employment Agreement states as follows:

(f) **Effectiveness and Expiration**. This Agreement has been approved by the Board on December 9, 2004, and is effective as of such date. This Agreement shall expire three (3) years following notice to Executive and actual occurrence of the first Change of Control following the date of this Agreement.

These provisions require mechanical application of mathematical calculations rather than an ongoing administrative scheme. The extension in Section 3(c) of Schieffer's eligibility to participate in DM&E's employee benefits programs or plans does not thereby render the Employment Agreement to constitute or create such a plan. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (noting that some state actions "may effect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan."). Rather, section 3(c) refers to separate "plans and programs" apart from the Employment Agreement itself. Section 3(c) gives DM&E an option to either allow Schieffer to continue to participate in ERISA-governed plans established by plan documents separate from the Employment Agreement or to pay cash to Schieffer, in an amount specified, in lieu of participation. Section 3(c) does not transform the Employment Agreement into an ERISA plan.

Section 5 concerns the calculation of severance payments to Defendant upon termination of his employment prior to a Change of Control. If termination occurs before a Change of Control, the Employment Agreement grants a contractually defined "Severance Payment" to Defendant, unless one of two events occurs: (a) "termination by the Company for Cause" or (b) "Voluntary Termination by the Executive." "Cause" consists of conduct in one's official capacity that "constitutes willful gross neglect or willful gross misconduct, resulting . . . in

material harm to the Company or any of its affiliates," and "Voluntary Termination" means "a termination of employment by the Executive at his initiative, other than for Good Reason." "Good Reason" consists of Defendant resigning following occurrence of one of four prescribed events occurring without his consent and without cure by the Company within 15 days of receiving written notice by Defendant. The prescribed events are: (I) a reduction in salary; (ii) a demotion in title; (iii) a diminution of Defendant's authority or duties; and (iv) relocation of Defendant. Termination also obligates DM&E to pay Schieffer Employee Benefits for at least three years from the date the Severance Payment is fully paid, unless DM&E opts to satisfy the Severance Payment in installments, plus interest, in which case the Employee Benefits continue for three years from the date of the first payment. In sum, Section 5 also provides a formula for calculation of Schieffer's compensation if DM&E fails to timely make a Severance Payment. Section 5, while involving some calculations, does not give rise to an administrative scheme sufficient to transform the Employment Agreement into an ERISA plan.

Section 9(f) establishes an expiration date for the Employment Agreement - three years following notice to Schieffer and actual occurrence of the first Change of Control following the date of the Employment Agreement. The Employment Agreement defines "Change of Control" as: (I) any person acquiring the right to elect a majority of the members of the Board of Directors; (ii) a majority of the Board of Directors at the time of consummation of an IPO subsequently ceasing to constitute a voting majority of the Board; (iii) occurrence of a merger or consolidation involving DM&E, unless holders of the voting securities prior to such merger or consolidation retain substantially the same proportion of voting securities after the merger or consolidation; or (iv) DM&E combining with another entity and becoming the surviving

corporation, unless holders of the voting securities prior to such combination retain substantially the same proportion of voting securities after the combination. The definition of "Change of Control" does not involve any significant nuances, create any ambiguity, or vest DM&E with discretion in determining whether a Change of Control has occurred. Rather, the Employment Agreement creates a bright-line test for determining Change of Control. In short, none of the three provisions of the Employment Agreement that DM&E urges give rise to an ERISA plan creates the sort of administrative scheme contemplated by Fort Halifax for an ERISA plan.

The Eighth Circuit has established the following factors to evaluate whether a plan is part of an ongoing administrative scheme and thus ERISA-governed: (1) whether the payments are one-time lump sum payments or continuous payments; (2) whether the employer undertook any long-term obligation with respect to the payments; (3) whether the severance payments come due upon the occurrence of a single, unique event or any time that the employer terminates employees; and (4) whether the severance arrangement under review requires the employer to engage in a case-by-case review of employees. Petersen v. E.F. Johnson Co., 366 F.3d 676, 679 (8th Cir. 2004); Crews v. Gen'l Am. Life Ins. Co., 274 F.3d 502, 505 (8th Cir. 2001).[5]

Applying the Petersen and Crews analysis, under the totality of the circumstances Schieffer's Employment Agreement is not an ERISA plan. As stated above, because the Employment Agreement involved a single employee, Schieffer, the Court applies particularly

---

[5]An alternative test for whether an ERISA plan exists under Eighth Circuit precedent is: "A plan is established for ERISA purposes when a reasonable person can ascertain (1) the intended benefits, (2) the class of beneficiaries, (3) a source of funding, and (4) the procedures for receiving benefits." Petersen v. E.F. Johnson Co., 366 F.3d 676, 678 (8th Cir. 2004) (citing Bannister v. Sorensen, 103 F.3d 632, 636 (8th Cir. 1996).

careful scrutiny to evaluating if an ERISA plan exists.

The payments to Schieffer, at DM&E's option, could have been made in a one-time lump-sum payment under the Employment Agreement. DM&E apparently sought to discharge, and believes that it has discharged, that responsibility to Schieffer. Simply because language allows DM&E an opportunity to continue providing employee benefits to Schieffer in lieu of a lump-sum payment under Section 3(c) does not change that the first and second factors under the Petersen and Crews analysis militate against concluding that the Employment Agreement is not an ERISA plan.

The payments to Schieffer came due upon a single unique event - his termination of employment. The Employment Agreement only applies to Schieffer, so the payments do not come due, under the third prong of the Petersen and Crews test, "any time the employer terminates employees." Although it is true that a determination of why Schieffer was terminated affects the amount owed under the Employment Agreement, the Employment Agreement does not require DM&E "to engage in a case-by-case review of employees," as it related solely to Schieffer. Petersen, 366 F.3d at 679.

The Employment Agreement reads more like an Employment Agreement than an ERISA plan. No provision referenced ERISA or created an ongoing administrative plan. Certainly, a primary purpose of the Employment Agreement was to establish the severance benefits to which Schieffer was entitled upon termination without cause or upon resignation for good reason. A subsequently executed Gross-Up Agreement designed to offset Schieffer's excise tax liability as a result of DM&E's payment of the severance benefits required mechanical application of

mathematical equations as opposed to discretionary determinations. Schieffer also claims various continuing benefits and bonuses under the agreements. However, the mere calculation and payment of these benefits for a certain, finite period is not sufficiently discretionary to rise to the level of an ongoing administrative scheme. Because the Employment Agreement does not establish an ERISA plan, none of Schieffer's state law claims are preempted by ERISA. Because the Employment Agreement is not and does not create and ERISA plan, this Court lacks jurisdiction in this case.[6]

---

[6]Even if the Employment Agreement constituted a plan governed by ERISA, the claims in Schieffer's Demand for Arbitration would not be preempted. ERISA claims are arbitrable. See Franke v. Poly-America Med. And Dental Benefits Plan, 555 F.3d 656 (8th Cir. 2009) (reversing and remanding to district court for entry of an order compelling arbitration under an ERISA plan); Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc., 847 F.2d 475, 477-79 (8th Cir. 1988) (holding that "agreements to arbitrate ERISA claims are enforceable in accord with the explicit provisions of the Arbitration Act."). "Arbitration agreements are to be enforced unless a party can show that it will not be able to vindicate its rights in the arbitral forum." Franke, 555 F.3d at 658 (quoting Faber v. Menard, Inc., 367 F,3d 1048, 1052 (8th Cir. 2004). This federal policy "applies equally to claims grounded in statutory rights," and the Eighth Circuit has "found no 'compelling basis to treat agreements to arbitrate ERISA claims differently.'" Id. (quoting Arnulfo P. Sulit, Inc., 847 F.2d at 479).

## III. CONCLUSION

Because ERISA does not govern the Employment Agreement, this Court lacks federal subject matter jurisdiction over this case. Accordingly, it is hereby

ORDERED that Defendant's Motion to Dismiss (Doc. 20) is granted.

Dated June 16, 2010.

                              BY THE COURT:

                              _____
                              ROBERTO A. LANGE
                              UNITED STATES DISTRICT JUDGE