UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DAKOTA, MINNESOTA & EASTERN | * | CIV 10-04037-RAL |
| RAILROAD CORPORATION, a | * | |
| Delaware Corporation, | * | |
| | * | OPINION AND ORDER |
| Plaintiff, | * | DENYING PLAINTIFF'S |
| | * | MOTION FOR INJUNCTION |
| vs. | * | PENDING APPEAL |
| | * | |
| KEVIN V. SCHIEFFER, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

## I. INTRODUCTION

On June 16, 2010, this Court issued an Opinion and Order ( Doc. 26) Granting

Defendant's Motion to Dismiss for lack of subject matter jurisdiction. Plaintiff Dakota,

Minnesota & Eastern Railroad Corporation ("DM&E") subsequently filed a Notice of Appeal

before the United States Court of Appeals for the Eighth Circuit (Doc. 31) on July 1, 2010. That

same day, DM&E filed a Motion for Injunction Pending Appeal (Doc. 29) under Rule 62 of the

Federal Rules of Civil Procedure. For the reasons explained below, the Court now denies

DM&E's Motion for Injunction Pending Appeal.

## II. FACTS

On September 13, 1994, the parties entered into an Agreement for Consulting

("Consulting Agreement"), under which Defendant, Kevin Schieffer, agreed to be available to

DM&E for "consulting and other specialist services" for 60 months in exchange for a total of

$1,530,000 plus hourly fees for time expended over an annual hourly threshold. (Doc. 7-1).

Under the Consulting Agreement, DM&E held the option of paying the retainer in full or in

monthly installments, and Schieffer would forfeit all compensation if the Agreement were terminated for "Cause" or if he failed to honor the agreement "without Reason." Retainer payments would be suspended if Schieffer suffered from "disability, incapacity or other circumstance" (terms not defined in the Agreement) that would render "provision of such services reasonably beyond Schieffer's control," and payments were to resume after such disability or circumstance ceased. (Id.).

In 1996, DM&E named Schieffer as its President and CEO. Schieffer contends that the Consulting Agreement was suspended when he became President and CEO and that his subsequent discharge rendered the unpaid portion of the retainer due. DM&E maintains that its Board of Directors terminated the Consulting Agreement in December 1999, granting Schieffer bonus stock and cash in return. DM&E points to the minutes from the Board of Directors' meeting from December of 1999, which state: "After discussion the Board approved the immediate termination of the consulting arrangement between the Corporation and Mr. Schieffer, granted an additional 10,000 bonus shares to Mr. Schieffer and awarded a cash bonus to Mr. Schieffer in the amount set forth in Exhibit B to these resolutions." (Doc. 7-2). The Consulting Agreement contained no arbitration provision.[1]

On December 9, 2004, the parties entered into an "Employment Agreement." (Doc. 7-1). "[A]nticipat[ing] a Change of Control," DM&E's stated purpose for the Employment Agreement was "to encourage the retention and ongoing employment of [Schieffer] and to enter into an agreement embodying the terms of such employment." (Doc. 7-1, at 14). The Employment

---

[1]This opinion and order does not express any view on the propriety of Schieffer's assertion that his claim under the Consulting Agreement is meritorious or is subject to arbitration based on the later Employment Agreement and its arbitration clause. This opinion and order does not express any view on whether DM&E might be entitled to obtain a stay of the arbitration of Schieffer's claim under the Consulting Agreement in a state court proceeding.

Agreement afforded Schieffer lucrative severance benefits upon a termination without "Cause" or upon resignation for "Good Reason."

The Employment Agreement included sections addressing Schieffer's position, duties, and responsibilities; compensation (divided into subsections outlining Schieffer's base salary, annual incentive award, and employee benefits); bonus share and equity; termination of employment; resolution of disputes; assignability, notices and other communications; as well as a "Miscellaneous" section. The "Employee Benefits" subsection stated that:

> "Executive shall be eligible to participate in all employee health, welfare and retirement benefits and programs made available generally to senior executives of the Company, and to the extent provided in such plans and programs the executive's spouse and other dependents shall be eligible to participate therein. In the event the Executive is not permitted to participate in such plans or programs, whether by law or the terms thereof, the Company shall periodically pay to the Executive, in lieu of such participation, a cash payment equal to the amount the Company would have contributed toward the Executive's participation in the plans or programs."

(Doc. 7-1, ¶ 3(c), at 18).

In 2007, the parties entered into a "Gross-Up Agreement" (Doc. 7-3) designed to offset Schieffer's excise tax liability, specifically liability under Section 409A of the Internal Revenue Code. The Gross-Up Agreement called for all severance payments to be "grossed-up" by an additional payment so that the net amount received by Schieffer after excise taxes would equal the sum he would have received if excise taxes had never been levied. Under the Gross-Up Agreement, payments due within six months of Schieffer's "Separation from Service" (as defined by the Internal Revenue Code) were to be "delayed until the earlier of the end of such six month period and [Schieffer's] death." (Id.).

DM&E terminated Schieffer, purportedly for insubordination, on October 7, 2008, effective October 22, 2008. Schieffer argues that the reasons for his termination did not

constitute "Cause" as defined in the Employment Agreement. As required by the Gross-Up Agreement, DM&E retained Deloitte Tax LLP ("Deloitte") to evaluate the tax ramifications of benefits payments to Schieffer. Deloitte opined that Schieffer's severance payout was not subject to a Section 409A penalty and thus could be paid immediately.

Ultimately, DM&E paid Schieffer a lump sum of $1,391,866.07 on January 20, 2009, the first bank business day after Deloitte issued its tax opinion. This amount was net of applicable withholdings and excise taxes, as the gross severance payout was $2,966,295.00. Schieffer was dissatisfied with the calculations behind that amount and believed that DM&E owed him more.

On March 25, 2010, Schieffer submitted to the American Arbitration Association ("AAA") his Demand for Arbitration (Doc. 7-1) disputing DM&E's interpretation of the Employment Agreement and the Consulting Agreement. Schieffer asserted claims under South Dakota contract and state wage laws, seeking the following relief: $247,166.50 for salary continuation; approximately $650,000 for 2008, 2009, and 2010 bonuses; more than $600,000 in allegedly miscalculated benefits, or continued employee benefits plan coverage; double damages for wrongfully withheld wages under SDCL 60-11-7; attorneys' fees; $892,500 as the remaining balance allegedly owed under the Consulting Agreement; and 10 percent interest on unpaid demands under SDCL 21-1-13.1.

In its Complaint, DM&E asserted that Schieffer's Employment Agreement is covered by the Employee Retirement Income Security Act of 1974 ("ERISA") and, consequently, Schieffer's state law causes of action are preempted by ERISA and not subject to arbitration. The Employment Agreement contained an arbitration provision, which provided:

Any controversy or claim arising out of, or relating to, this Agreement (or any breach

-4-

thereof) or the Executive's employment with the Company (or any termination thereof) shall, at the election of either Party, be resolved by binding confidential arbitration, to be held in Sioux Falls, South Dakota, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(Doc. 7-1, ¶ 6, at 20).

The Consulting Agreement had no arbitration clause. Schieffer, in his Demand for Arbitration, contended that under the broad terms of the arbitration provision, his claim regarding the Consulting Agreement is a "claim arising out of, or relating to" his employment with the Company (or termination thereof)," thereby rendering it subject to resolution by arbitration. (Id.).

On April 30, 2010, Schieffer filed a Motion to Dismiss (Doc. 20), which this Court granted for lack of subject matter jurisdiction (Doc. 26). On July 1, 2010, DM&E filed its Notice of Appeal (Doc. 31), as well as its Motion for Injunction Pending Appeal (Doc. 29).

## III. DISCUSSION

### A. Rule 62

Rule 62 permits courts to order a stay, pending appeal, of an interlocutory or final judgment in an action for an injunction. Because dismissal of DM&E's action had the effect of denying its request for injunctive relief, DM&E moved for an injunction pending appeal under Rule 62(c), which states:

While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.

Fed. R. Civ. P. 62(c).

"In ruling on a request for an injunction pending appeal, the court must engage in the

same inquiry as when it reviews the grant or denial of a preliminary injunction." Walker v. Lockhart, 678 F.2d 68, 70 (8th Cir. 1982). Rule 62(c) "is expressive of the power in the courts to preserve the status quo pending appeal." Pettway v. American Cast Iron Pipe Co., 411 F.2d 998, 1003 (5th Cir. 1969); see also Walker, 678 F.2d at 70 (observing that, in such cases, the movant asks the court to "maintain the status quo until the court rules on the merits of the legal action to which the movant is a party.").

In determining whether to grant a stay pending appeal under Rule 62, this Court employs a version of the traditional four factors established by Dataphase Sys. Inc. v. C.L. Sys. Inc., 640 F.2d 109 (8th Cir. 1981), for use in a preliminary injunction determination:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
> (2) whether the applicant will be irreparably injured absent a stay;
> (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and
> (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987); see also Reserve Mining Co. v. United States, 498 F.2d 1073 (8th Cir. 1974). "The applicant bears the burden of establishing the propriety of a stay." SAGE v. Osseo Area Schools, 2006 U.S. Dist. LEXIS 17175, No. 05-2100, at *4 (D. Minn. 2006) (citing Reserve Mining Co. v. United States, 498 F.2d 1073, 1076 (8th Cir. 1974)).

In considering requests for an injunction pending an appeal, the court maintains a flexible approach when applying the Dataphase factors and balancing the equities between the parties, and the court "need not engage in detailed analysis of [movant's] probability of success on the merits." Walker, 678 F.2d at 70-71; see also Hilton, 481 U.S. at 777 ("Since the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a

set of rigid rules."). In Walker, the United States Court of Appeals for the Eighth Circuit granted an injunction pending appeal of a denial of a motion for a protective order because the merits of the appeal "involve[d] substantial questions of law which remain to be resolved," and injunctive relief pending appeal would not have imposed an undue burden on the non-moving party. Id. at 71. In such cases, the equities of the case may "require the court to intervene to preserve the status quo pending the outcome" of the appeal. Id.; see also Wash. Metro. Area Transit Comm'n. v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (noting that a stay pending appeal to maintain the status quo "is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant."); J. Weingarten, Inc. v. Potter, 233 F. Supp. 833, 838-39 (S.D. Tex. 1964) (granting stay pending appeal, despite previously granting motion to dismiss, because if the Court, after holding that it lacked jurisdiction to hear action for injunction, was reversed on appeal, plaintiff's victory would be "a hollow victory indeed, one of mere academic interest.").

## B. **Dataphase** Analysis

### 1. **Likelihood of Success on the Merits**

This Court's Opinion and Order Granting Defendant's Motion to Dismiss (Doc. 26) discussed in detail the reasons why federal jurisdiction does not exist and why Defendant's Motion to Dismiss was granted. DM&E noted in its brief that courts recognize that the first factor - i.e. likelihood of success on the merits - becomes complicated when a party seeks injunctive relief pending appeal. Sweeney v. Bond, 519 F. Supp. 124, 132 (E.D. Mo. 1981) ("Clearly, any trial judge is reluctant to find that a substantial likelihood exists that he or she will

be reversed. As a result, trial courts have issued or stayed injunctions pending appeal where such action was necessary to preserve the status quo where the legal questions were substantial and matters of first impression.") (citing Mesabi Iron Co. v. Reserve Mining Co., 268 F.2d 782, 783 (8th Cir. 1959)). Nevertheless, a stay pending appeal will be denied when an action does not present new legal questions that might reflect on the substantive correctness of an order effectively denying an injunction. See North Central Truck Lines, Inc. v. United States, 384 F. Supp. 1188, 1191 (W.D. Mo. 1974).

The case at bar does not present unresolved substantial legal questions or matters of first impression. Both parties acknowledge that this Court's subject matter jurisdiction turned on whether the Employment Agreement constituted an ERISA plan. Because the Employment Agreement was not an ERISA plan, this Court granted Schieffer's motion to dismiss for lack of subject matter jurisdiction.

In determining the issue of whether the Employment Agreement constituted an ERISA plan, the Court applied the touchstone of "[w]hether the employer requires 'an ongoing administrative program' to meet [its] obligation." Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 12 (1987)). Such a scheme exists when 'to determine the employees' eligibility for and level of benefits, the employer must analyze each employee's particular circumstances in light of the appropriate criteria." Eide v. Grey Fox Tech. Servs. Corp., 329 F.3d 600, 605 (8th Cir. 2003) (citation omitted) (quoting Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994)). "Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits,

-8-

must analyze each employee's particular circumstances in light of the appropriate criteria." Kulinski, 21 F.3d at 257.

An employment agreement requiring a one-time, lump-sum payment or single set of payments triggered by a single event is not an ERISA plan, as it "requires no administrative scheme whatsoever to meet the employer's obligation." Fort Halifax, 482 U.S. at 12. An ongoing administrative program typically exists when there are "ongoing benefits to be paid," id. at 14-15 n.9, or if there is a "regularity of payment." Id. at 18 n.12. "Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme." Kulinski, 21 F.3d at 257. Accordingly, numerous Circuits have all held that a plan does not require an ongoing administrative scheme under ERISA even if the employer must exercise a small amount of discretion. See Rodowicz v. Mass. Mut. Life Ins., 192 F.3d 162, 172 (1st Cir. 1999); Velarde v. PACE Membership Warehouse, Inc., 105 F.3d 1313, 1316-17 (9th Cir. 1997) (holding that requirement that employees must perform duties in "satisfactory manner" to receive benefits did not constitute an ERISA plan); Delaye v. Agripac, Inc., 39 F.3d 235, 237 (9th Cir. 1994) (holding that severance of employment contract did not require ongoing administrative scheme, even though employer had to determine if employee was terminated for cause to calculate severance pay).

In reaching its determination, this Court applied the well-established factors enunciated by the Eighth Circuit for evaluating whether a plan is part of an ongoing administrative scheme and thus ERISA-governed: (1) whether the payments are one-time lump sum payments or continuous payments; (2) whether the employer undertook any long-term obligation with respect to the payments; (3) whether the severance payments come due upon the occurrence of a single,

unique event or any time that the employer terminates employees; and (4) whether the severance arrangement under review requires the employer to engage in a case-by-case review of employees. Petersen v. E.F. Johnson Co., 366 F.3d 676, 679 (8th Cir. 2004); Crews v. Gen'l Am. Life Ins. Co., 274 F.3d 502, 505 (8th Cir. 2001).[2] In an attempt to differentiate this case from Fort Halifax and to satisfy the test in Petersen and Crews for whether there is an ongoing administrative scheme, DM&E argued that it was required to make various discretionary determinations under Sections 3(c), 5, and 9(f) of the Employment Agreement. (Doc. 23, at 12). The Court found that these provisions required mechanical application of mathematical calculations rather than an ongoing administrative scheme. The provisions of the Employment Agreement did not create the sort of administrative scheme contemplated by Fort Halifax for an ERISA plan. Because the Employment Agreement does not establish an ERISA plan, none of Schieffer's state law claims were preempted by ERISA. Because none of Schieffer's state law claims were preempted by ERISA, this Court lacks jurisdiction in this case.

This Court disagrees with DM&E's argument of likelihood of success on the merits. DM&E raised no legal issue of first impression or substantial legal question that remains to be resolved. Rather, the Court applied the accepted, binding standard for determining whether a plan is ERISA-governed, and the Court determined that the Employment Agreement was not. Consequently, DM&E is unlikely to succeed on the merits of its appeal.

**2. Threat of Irreparable Harm**

---

[2]An alternative test for whether an ERISA plan exists under Eighth Circuit precedent is: "A plan is established for ERISA purposes when a reasonable person can ascertain (1) the intended benefits, (2) the class of beneficiaries, (3) a source of funding, and (4) the procedures for receiving benefits." Petersen v. E.F. Johnson Co., 366 F.3d 676, 678 (8th Cir. 2004) (citing Bannister v. Sorensen, 103 F.3d 632, 636 (8th Cir. 1996)).

Because DM&E argues that Schieffer's claims are not arbitrable, DM&E defines the threat of irreparable harm in this case as DM&E being compelled to proceed before the AAA (or risk a default judgment) in a suit that is not arbitrable. According to DM&E, subjection to such a dispute resolution process would deny it of its constitutional right to a trial by jury and usurp the Court's authority to determine arbitrability. In support, DM&E cites authority holding that "the injury to a party who is forced to submit to arbitration when it did not agree to do so constitutes *per se* irreparable harm." Medtronic, Inc. v. ETEX Corp., No. 04-1355, 2004 WL 768945, at *2 (D. Minn. Apr. 12, 2004) (citing McLaughlin Gormley King Co. v. Terminix Int'l Co., 105 F.3d 1192, 1194 (8th Cir. 1997) (affirming injunction against arbitration pending resolution of arbitrability). Thus, DM&E argues that if a stay is not granted and dismissal is ultimately reversed, then the harm to DM&E will be irreparable.

On the other hand, authority also holds that a stay of arbitration pending appeal of an order compelling arbitration "would, as a general rule, put too great a burden on the arbitration process" and the policy favoring arbitration as a mode of dispute resolution. Sentry Ins. v. Pearl, 662 F. Supp. 1171, 1174 (E.D. Pa. 1987). Indeed, "[t]he Supreme Court has made clear that federal policy favors arbitration." Team Tires Plus, Ltd. v. Heartlein, 2001 U.S. Dist. LEXIS 20444, No. 01-1197 (D. Minn. 2001) (denying motion for preliminary injunction and motion for stay of arbitration) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983) (noting the "liberal federal policy favoring arbitration agreements")). As a result, this factor does not tip sharply in DM&E's favor.[3]

---

[3]Even if the Employment Agreement constituted a plan governed by ERISA, Schieffer could recast the claims in his Demand for Arbitration to make them arbitrable. ERISA claims are arbitrable. See Franke v. Poly-America Med. & Dental Benefits Plan, 555 F.3d 656 (8th Cir.

## 3. Prejudice to Schieffer

DM&E contends that Schieffer would not be harmed if arbitration were enjoined pending appeal because there is no immediate need to proceed with arbitration. In support, DM&E cites the fact that Schieffer waited nearly a year-and-a-half after his termination to file the Demand for Arbitration, which in turn resulted in DM&E filing its Complaint in this Court. However, the burden of a stay of arbitration pending the entire appeal process would significantly prejudice Schieffer to the extent that it would protract this dispute by considerably delaying resolution of Schieffer's claim in the arbitral forum. The Employment Agreement clearly provided to Schieffer, and DM&E as well, the right to arbitrate claims based on the Employment Agreement.

## 4. The Public Interest

DM&E simply recites the basic principle that the public interest is well-served by the enforcement of contracts. The public interest is also well-served by the resolution of disputes by arbitration. See Moses H. Cone Mem'l Hosp., 460 U.S. at 25. The public interest, under the circumstances, does not favor further delay of arbitration of state law contract claims under the Employment Agreement between two South Dakota citizens who voluntarily agreed to arbitrate claims.

---

2009) (reversing and remanding to district court for entry of an order compelling arbitration under an ERISA plan); Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc., 847 F.2d 475, 477-79 (8th Cir. 1988) (holding that "agreements to arbitrate ERISA claims are enforceable in accord with the explicit provisions of the Arbitration Act."). "Arbitration agreements are to be enforced unless a party can show that it will not be able to vindicate its rights in the arbitral forum." Franke, 555 F.3d at 658 (quoting Faber v. Menard, Inc., 367 F.3d 1048, 1052 (8th Cir. 2004). This federal policy "applies equally to claims grounded in statutory rights," and the Eighth Circuit has "found no 'compelling basis to treat agreements to arbitrate ERISA claims differently.'" Id. (quoting Arnulfo P. Sulit, Inc., 847 F.2d at 479).

## IV. CONCLUSION

DM&E has not met its burden for obtaining an injunction pending appeal. DM&E has not made a strong showing that it is likely to succeed on the merits of its appeal because it did not raise substantial legal questions or matters of first impression regarding the dispositive issue of subject matter jurisdiction. In addition, the equities do not weigh strongly in DM&E's favor. Staying arbitration would burden the arbitration process and forestall Schieffer's ability to proceed with arbitration of his claims against DM&E. DM&E's Complaint for injunctive relief was dismissed for lack of subject matter jurisdiction, and this Court declines to exert such jurisdiction to issue injunctive relief pending appeal. Therefore, it is

ORDERED that DM&E's Motion for Injunction Pending Appeal (Doc. 29) is denied.

Dated July 13, 2010.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

-13-